MONTGOMERY *v.* HUNT.

1. Where suit was brought by the holder of a promissory note payable to the order of a named person and indorsed by the payee in blank, and the defendant in his plea admits the execution of the note and the ownership of it by the plaintiff, a *prima facie* case for the latter is made out. The burden of proof to establish his defence is upon the defendant, and consequently he is entitled to open and conclude.

2. Where a promissory note is given contemporaneously with a written agreement between the same parties which states the consideration of the note, the two instruments constitute one contract and are to be construed together; and the maker of the note, when sued thereon by one who purchased it before maturity, for value, may plead the failure of consideration and also that when the plaintiff purchased he knew what the consideration was and that it had failed, or had sufficient notice to put him upon inquiry which would lead to a knowledge of these facts.

January 27, 1894.                    *Judgment reversed.*

Action on note. Before Judge SMITH. City court of Hall county. May term, 1893.

J. H. Hunt sued T. B. Montgomery on a promissory note payable to the order of Magee, Fletcher & Co., and indorsed by them. The jury found for the plaintiff, and the defendant excepted to the refusal of a new trial. The pleas of the defendant set up that the note was without consideration, and that the plaintiff was not a *bona fide* holder without notice. The defendant testified that the note was signed in connection and at the same time with a written contract in evidence, between Magee, Fletcher & Co., of the first part, and the defendant of the second part, reciting that the parties of the first part, having established a permanent industry in Gainesville for the purpose of manufacturing and selling the Champion Combination Slat and Wire Fence, do hereby

make and constitute the party of the second part a lawful agent with power to contract or sell the manufactured fence in a certain district of that county, the manufactured fence to be kept in stock by the manufacturing agent, D. E. Evans, at Gainesville, and at all times to be furnished to the second party at certain stated prices; that the manufacturing agent has also bound himself " to use his endeavor to sell the fence, and all sales made by him or at the factory to credit the precinct agent wherein the fence goes with twenty-five cents per rod "; that the party of the second part, in consideration of the rights and privileges herein granted, agrees to use his endeavors to sell the fence in the territory named " and pay the first parties five cents per rod of the commissions after he has sold 1,000 rods of fence and received all of the commissions, $250, as he has this day secured to be paid $125 by execution of his note, being one half of the commission on the first 1,000 rods sold, and if 500 rods of fence have not been sold at the end of six months by the said second party, then the said company or their authorized representative are fully empowered to cancel the agency and appoint another agent in his stead; but if they decide to cancel said agency, which shall be at their option, they shall surrender said note after first being paid one half of the commissions on the fence sold during the said six months," etc. This agreement and the note were each dated March 21st, 1892. There was testimony by the defendant and his son, that, six days after the note was signed, defendant received from one Bearden a letter asking if the note was all right and if it was safe to buy it, to which defendant replied that he supposed he signed the note, but did not expect to have to pay it on the conditions upon which he signed it. He did not expect to have much, if anything, to pay on it, as he did not think the fence would sell in his district, and he had

signed the note on these conditions. On the first Tues-
day in April he met the plaintiff, who asked him, "How
are you getting along selling fences?" "Not very well,"
replied the defendant. Said plaintiff, "Well, I have
bought your note." Defendant said, "I did not think
you would have bought that note." Plaintiff replied,
"I saw your letter to Bearden about the note, but when
I saw the note was payable to order, I bought it. I
will buy all such notes as that, especially with your
name on them." On this point the plaintiff testified
that he purchased the note from Magee a few days after
it was given, paying value for it; knew of nothing to
make it defective, and had no knowledge or notice of
anything to make it invalid; never saw defendant's let-
ter to Bearden about the note, and did not tell defend-
ant he had seen it; never knew anything about that
letter to Bearden. Magee was a stranger at this place.
Plaintiff did not know him. Plaintiff only knew he
was going about in the country selling a patent fence,
or rights to it, and taking notes. Plaintiff bought three
notes from him, and this is one of them. Martin
and plaintiff afterwards bought four more. Plaintiff
did not know, when he bought, what the note sued on
was given for. He knew they were dealing in fences.
He made no inquiry about it; supposed it was some-
thing about the fence. Did not ask Magee how defend-
ant came to make him the note or anything else; did not
know anything about Magee, Fletcher & Co. or their
solvency, and knew nothing about the contract.—T. M.
Bell testified that he was interested with Bearden, and
wrote to Montgomery the letter mentioned. At that
time Magee had the note. When the answer to the let-
ter came it was read by witness and Bearden. Witness
thought there was enough in the letter to keep him
from buying the note, and in five minutes tore up the
letter. No one saw it but him and Bearden. Hunt did

not see it, nor did witness tell Hunt about it. The letter stated that defendant did not expect to have much, if anything, to pay on the note, which was signed on conditions; but did not state the conditions.

The defendant gave also the following testimony: A man representing himself to be Magee came up the road in a buggy, and getting out came to see me, and said he wanted me to act as agent to sell a patent wire fence. He said Jack Thompson and William Byers had consented to become agents in their districts, and he wanted a good man in my district; that if I did not make anything I could not lose anything. He said I would have the exclusive right to sell in my district, and would only have to pay a certain commission on what fence I actually sold. He then read me the contract in evidence, and the note, but in reading the note I do not think he read the words "or order of." I hesitated about signing the note. He said that the contract was that the note was only given as security for what commissions would be due them or their part of the commissions if I sold any fence, and I would not have anything to pay on the note unless I sold some of the fence, and then only their part of the commissions. He said the note was only given as security, and that it would not and could not be traded; that it was more than they dare do to trade the note; that the notes taken by them would be filed away in their office to secure payment. I can read, but not without glasses. I did not have my glasses with me and could not read the contract or note, and he read them to me. He said he would send to my post-office, Murraysville, samples of the fence in two or three days. I signed the contract and note upon these statements and the reading of the same by him. He was a stranger to me. I never saw anything more of him. I have never sold a foot of the fence. He did not send the samples as promised. I never had any

sample with which to try to sell. I have been a member of the legislature. I never tried to sell the fence because I never received the sample. I never applied to D. E. Evans in Gainesville for any of the fence. (Counsel read over to witness that part of the plea in reference to the establishment of a factory in Gainesville. Witness testified that he did swear to that plea that no factory had been established in Gainesville.) I did not know whether Mr. Evans had one here or not; I never asked him about it. I knew he was to be the manufacturing agent. My information was they had gone off a short time after I gave the note and carried their factory with them.

D. E. Evans testified, among other things, that he was appointed agent to manufacture the fence, and contracted with Magee, Fletcher & Co. to manufacture it and put up a factory; that they brought a machine to Gainesville to make it, and witness always had the fence for sale, and made and still makes it, and that defendant never applied to him for any of the fence. The fence is good. Witness sold lots of it. Magee, Fletcher & Co. put up the factory, which is still there. On cross-examination the witness testified that the machine had not been used in a month; that Magee, Fletcher & Co. never bought any land or built any house, and there was no sign showing a factory was there, etc.

The motion for new trial alleges that the verdict is contrary to law and evidence, and that the court erred in refusing to allow the counsel for defendant to open and conclude the argument. Also, that the court erred in charging: " The defendant sets up as defence that he gave the note sued on, only as collateral security for the commissions which might be due Magee, Fletcher & Co., and that nothing was to be due them only the commissions on sales when they should be made. As to this, I charge you that the note is unconditional, and

is payable at the time stated in it. The agreement in evidence does not annex any condition to it, and the failure of the defendant to sell the fence would not prevent a recovery by the plaintiff, even if he had notice of that fact. The fact that the defendant did not sell the fence or that he did not realize anything from the sale of it, would be no defence to a suit by the plaintiff or any one else on the note." And in refusing to charge : " The contract in evidence between defendant T. B. Montgomery and Magee, Fletcher & Co., the payee of the note, should be construed according to the sense put upon it by the parties at the time of the execution of the contract. If you should find from the evidence that Magee or Fletcher, at the time of the execution of the note or contract, said its effect would be that the note would be only collateral or security for the amount which would be due them by Montgomery as their part of the commissions on the fence sold by him, Montgomery, and that he would not have anything to pay on said note unless he should succeed in selling some of the fence, and if you find that Montgomery understood this to be the meaning of the contract at the time, then the contract will be construed according to and as having that meaning."

PERRY & CRAIG, for plaintiff in error.

J. B. ESTES and J. C. BOONE, contra.